## STATE v. EVERETT R. LUX.[1]

November 23, 1951.

No. 35,558.

*Harry E. Burns,* for appellant.
*Frank L. King,* County Attorney, for the State.

FRANK T. GALLAGHER, JUSTICE.

Appeal from a judgment and sentence of the district court and from an order denying defendant's motion for a new trial.

The legal issue raised by defendant is whether the evidence is sufficient to sustain a verdict of guilty against him where he contends that there is no evidence that he directly committed the offense, but rather that the evidence merely shows that he is an officer of the corporation selling the seed involved.

[1]Reported in 50 N. W. (2d) 290.

Defendant assigns as error that the court erred in denying his motions (1) for a dismissal; (2) for a directed verdict; and (3) for a new trial. All assignments are based on the proposition that the evidence is insufficient as a matter of law to support the verdict.

The facts are substantially as follows:

Defendant was charged in an information with selling, offering, and exposing for sale on March 13, 1950, at Long Prairie, Todd county, this state, certain agricultural alsike clover seed containing in excess of 25 hoary alyssum seeds per pound of clover seed, contrary to "Minnesota Statutes 1947, Section 21.03." The trial court calls our attention in its memorandum to the correct statutory reference, "Minnesota Statutes 1949, Section 21.03," and states that the error in citing the statute in the information did not appear to have prejudiced the substantial rights of defendant and did not constitute fundamental error. The information further states that on May 28, 1949, defendant, upon his plea of guilty, was convicted of a violation of the same statute and that if he were found guilty of the violation alleged to have occurred on March 13, 1950, it would constitute a second conviction under that statute.

It appears from the evidence presented by the state that George O. Hammerbeck, a district weed and seed inspector, accompanied by Harry Bugh, Todd county seed and weed inspector, called at the Lux Implement Company store in Long Prairie on March 13, 1950, and took three samples of seed from the place. Included in these samples was one of alsike clover seed which Hammerbeck obtained from a bag or sack containing about 150 pounds of the seed. The bag stood in approximately the center of the store, with the top open and rolled back. The sample was taken with a probe about 30 inches long. Hammerbeck testified that defendant was not in the store when he first arrived, but that he came in just about the time the witness finished sampling; that he requested defendant to allow him to take the original tag off the bag from which the sample was taken and to replace it with a replacement tag used by the inspector, but that this request was refused by defendant because the latter said that the tag was furnished by a certain

elevator company in Minneapolis; that the seed was cleaned by them, so defendant did not want to let the tag go. The witness was then asked:

"Q. And he [defendant] wouldn't then permit you to take the tag that was on the container?

"A. No."

Hammerbeck also said that at about that same time he asked defendant to sign as a witness a report which he had prepared in connection with the taking of the samples, but that the defendant refused to sign. After taking the sample, which appears to have been a routine check, the inspector put it into a sample envelope, which was placed in the back seat of his car and mailed by him to the state seed laboratory with other samples on the following Saturday. When the sample was received at the seed laboratory it was filed. Subsequently, a seed analysis was made on a ten-gram analysis of the sample, which disclosed 69 hoary alyssum seeds. William I. Alsen, a seed analyst at the state seed laboratory of the department of agriculture, who made the analysis of the sample involved, testified that on the basis of 69 hoary alyssum seeds in ten grams it would amount to 3,105 seeds per pound. Other witnesses were produced by the state, including the county seed inspector, another seed analyst, and the supervisor of seed inspection, in connection with supporting testimony with respect to the taking of the sample from the store, the analysis of the sample, and other routine testimony involving the inspection and testing of seed. Dockets of a justice of the peace were introduced in evidence showing that on March 30, 1949, three complaints were filed against defendant for violations of state seed laws and that on May 28, 1949, defendant entered pleas of guilty on each of those charges. Defendant admitted in his brief that on May 28, 1949, he entered a plea of guilty to the same offense as that involved here.

At the close of the state's case, defendant moved for a directed verdict on the ground that it appeared from the evidence that it was the Lux company which was involved and that the state had not shown that defendant, as a manager or as a clerk or in any

other way, had anything to do with the seed under consideration. The motion was denied. Defendant then introduced evidence through the register of deeds of Todd county that articles of incorporation of the Lux Implement Company were filed in his office on October 14, 1948, at 8 a. m.

The only other witness produced on behalf of defendant was his son Robert, aged 24 years. Defendant himself did not testify. Robert testified on direct examination that he had been a stockholder, secretary, and treasurer of the Lux Implement Company (changed on cross-examination to secretary) since its incorporation in October 1948 and that this corporation was in existence on March 13, 1950. He said that his father (defendant) is president of the corporation and that his brother, Everett W. Lux, aged 30 years, is vice president. He explained that the business in which the corporation is engaged is divided into different departments, such as the implement department and the hardware and appliance department, and that the firm handled everything from a nail to a threshing machine. He said that he looked after the hardware and appliances, his brother the implements, and that his father looked after a little bit of both departments, but mostly implements and collections. Robert further said that the hardware department handled the seed; that he put the sack of seed on the floor of the store; and that he was present on March 13, 1950, when Hammerbeck took the sample from which a subsequent test was made. On cross-examination, the witness said that he returned from the service in 1945 after having been absent for about two and one-half years; that thereafter he spent some time in school, but took an active part in the business in the summertime until 1949, when he commenced to devote his entire time to the business; that his brother, Everett W., was also in the service, but returned to the business in 1945, and immediately began to take an active part in the business; and that during the time he and his brother were away his father operated and handled the business. He was questioned on cross-examination about the existence of a Lux Seed Company, which he said had been dissolved. He testified that he was not familiar to any great

extent with that company, but that during the time it was in existence it handled the seed end of the business. He disclaimed any knowledge whatsoever of the operations of the Lux Seed Company, except to say that upon its dissolution either the latter part of 1949 or early in 1950 the Lux Implement Company took over the handling of the seed business. In connection with the Lux Implement Company, he testified on cross-examination:

"Q.  Your father, then, is president and treasurer of that corporation, is he not?

"A.  Yes, sir.

"Q.  And he is the general manager and overseer of the business, is he not?

"A.  Yes, sir."

On redirect examination he said:

"Q.  You state that your father is the general manager and overseer of that business?

"A.  No—"

This question was objected to as improper redirect examination, and the objection was sustained.

When defendant rested and at the close of the testimony, he moved for a dismissal on the ground that there was no evidence to go to the jury that he was in any way connected with the sale or offering for sale of the seed or that he had anything to do with it; that the evidence showed that the Lux Implement Company is a corporation, which must be considered as an individual for the purpose of the trial; and that defendant was wrongfully named. Defendant further argued on this motion that if there was a violation it must be on the part of the corporation and not the defendant. The court denied the motion, stating in part that the jury could determine from the evidence whether the state had proved beyond a reasonable doubt that defendant had ever offered this seed for sale through the instrumentality of a corporation of which he was the general manager and overseer.

M. S. A. 21.03, subd. 2, provides:

"It shall be unlawful for any person to sell, or to plant in this state any agricultural seed when such agricultural seed contains or the label thereon shows a weed seed content in excess of the following limits per pound of such agricultural seeds:

"* * * 25 seeds of * * * Hoary Alyssum (Berteroa incana), singly or collectively."

"Person" is defined in § 21.01, subd. 2, as follows:

"The word 'person' includes corporations, copartnerships, companies, societies, firms, and associations."

In connection with the word "sell," § 21.01, subd. 8, provides in part:

"The word 'sell' shall be construed when applying to agricultural seed and screenings or samples thereof as including (a) the act of selling or transferring ownership, (b) the offering or exposing for sale, exchange, distribution, giving away or transportation in this state, (c) the having in possession with intent to sell, exchange, distribute or give away the same, (d) the storing, carrying or handling in aid of traffic therein, whether done in person or through an agent, employee or others, and (e) receiving, accepting or holding on consignment for sale."

Defendant argues that it is difficult to conceive of any situation under the act where it would not be a crime to have in possession a sack of seed with an excessive weed content unless one were the consumer. Although he claims that the state did not pay any particular attention to proof that there was a violation of the act with reference to selling, he concedes that a crime within the meaning of the act was sufficiently proved. He further concedes that under the law an officer of a corporation may be criminally liable for acts committed by the corporation, provided it is proved that such officer aided or abetted the commission of the crime or, in some cases, that he was general manager of the corporation. He contends that the state failed to prove that this is one of the cases where an officer of a corporation is criminally liable for an act committed by another.

Defendant's appeal presents an interesting question, to which we have given serious consideration. Boiled down, it amounts to this: Was there evidence sufficient to sustain a finding of the jury that defendant was guilty of the offense charged? If there is reasonable evidence to sustain the conviction, it cannot be disturbed upon review. State v. Ronnenberg, 214 Minn. 272, 7 N. W. (2d) 769.

■ Although a director or other officer of a corporation is not ordinarily criminally liable for acts performed by other officers or agents of the corporation, he is criminally liable for his own acts, although done in his official capacity, if he participated in the unlawful act, either directly or as an aider, abettor, or accessory. State v. McBride, 215 Minn. 123, 130, 9 N. W. (2d) 416, 420; 13 Am. Jur., Corporations, § 1100; 3 Fletcher, Cyc. Corp. (Perm. ed.) § 1348; Rigrish v. State, 178 Ind. 470, 99 N. E. 786. It was held in State v. Brown, 155 Minn. 245, 193 N. W. 169, involving a partnership, that a person may be found guilty of selling liquor although it was not shown that he participated in the particular sale. In the McBride case, this court further said (215 Minn. 131, 9 N. W. [2d] 420):

"It is the universal rule that an officer or agent of a corporation cannot avoid responsibility for his act on the ground that it was done in his official capacity, nor can he assert that acts in corporate form are not his acts merely because they are carried on by him through the instrumentality of the corporation which he controls and dominates and which he has employed for that purpose. State v. Milbrath, 138 Wis. 354, 120 N. W. 252, 131 A. S. R. 1012; State ex rel. Attorney General v. Standard Oil Co. 49 Ohio St. 137, 30 N. E. 279, 15 L. R. A. 145, 34 A. S. R. 541; Kaufman v. United States (2 Cir.) 212 F. 613, Ann. Cas. 1916C, 466; Overland Cotton Mill Co. v. People, 32 Colo. 263, 75 P. 924, 105 A. S. R. 74; State v. Ross, 55 Or. 450, 104 P. 596, 106 P. 1022, 42 L.R.A.(N.S.) 601, 613, appeal dismissed, 227 U. S. 150, 33 S. Ct. 220, 57 L. ed. 458; State v. Thomas, 123 Wash. 299, 212 P. 253, 33 A. L. R. 781; State v. Cooley, 141 Tenn. 33, 206 S. W. 182; Rigrish v. State, 178 Ind. 470, 99 N. E. 786, *supra*."

The McBride case offers an interesting comparison with the case at bar, with the exception that there the crime involved was one of selling intoxicating liquor without a license in violation of a city ordinance. Defendants McBride and Horrigan were convicted in municipal court of that crime. Although tried separately, this court made an order consolidating the two actions for purposes of appeal. Horrigan, as president and treasurer of the National Drug Company, a corporation, managed a retail drugstore doing business under a separate tradename, which was owned by the National company and located in Minneapolis. The offices of the National company and stock ownership were held by Horrigan and members of his immediate family. McBride, a registered pharmacist, was employed by the National company and worked under Horrigan's supervision at the retail drugstore. McBride, on appeal, raised the question of the sufficiency of the evidence to sustain his conviction of selling liquor without a license. This court held that there was abundant evidence to support his conviction. The same question was also raised on the Horrigan appeal. In addition, another issue was involved in that case and that was whether the evidence implicated Horrigan in the charge of selling liquor without a license in violation of the ordinance. Horrigan contended that even though a sale of liquor was proved as to McBride there was no evidence to associate or connect him with the sale; that the company which owned and operated the retail drugstore was also a corporation and that, although he was president of the retail drugstore corporation, he was not present when the sale was made; and that, as such officer, he could not be charged with the criminal acts of one of the corporation's agents or servants of which he had no knowledge. The state, on the other hand, maintained that the corporation was a family affair; that Horrigan was the dominating and active individual in exclusive charge and control of its operation; that he knew that the liquor was stored on the premises; and that it was there for the purpose of illegal sale in violation of the ordinance. It was undisputed that the officers found 382 pints and 22 quarts of assorted liquor in the storeroom behind the prescription counter.

The state further proved a direct sale of a pint of whiskey by an employe of the drug company who was under Horrigan's immediate supervision and control. Horrigan did not testify in his own behalf, nor was there any explanation offered in his trial as to why such a great quantity of liquor was kept upon the retail drugstore premises. This court there said that as active manager of the business there was a reasonable inference that Horrigan had knowledge that illicit sales of liquor were being made on the premises and that the evidence satisfactorily supported an inference that Horrigan had liquor in his possession for purposes of sale without a license. Under the ordinance there, a sale included having liquor in possession for the purpose of sale. The National Drug Company, the corporate legal entity operating this business, had no license to sell liquor nor any permit to issue prescriptions therefor. The court then went on to say that the large quantity of liquor found on the premises without explanation by Horrigan, together with the actual sale of liquor by McBride, who was under Horrigan's supervision and control, was sufficient to justify a finding that Horrigan as an individual, separate and apart from the corporation, was guilty of illegal dealings in liquor in violation of the ordinance. A corporation has been defined as "an artificial person, created by law, or under authority of law, from a group or succession of natural persons, * * *." 2 Dunnell, Dig. & Supp. § 1969, and cases cited therein. While the court there said that there was substantial reason for believing that Horrigan was attempting to use a corporate legal entity as a shield of protection for himself in his unlawful activity of selling liquor and that in some cases the court is justified in disregarding the corporate entity altogether, citing Lake Park D. Co. v. Steenberg Const. Co. 201 Minn. 396, 402, 276 N. W. 651, 655, the opinion further stated that where a corporation is used by an individual as an instrument of fraud, or to hinder and delay and, if possible, defraud creditors, or for other wrongful purposes, courts will go as far as necessary in disregarding the corporation and its doings in order to accomplish justice. Horrigan emphasized his contention that, inasmuch as he was not present when the liquor was

sold and knew nothing of the sale, he could not be held accountable for the conduct of McBride, who was acting for the corporation; but the court disregarded this claim because of the evidence which showed that Horrigan employed McBride and controlled and supervised his activities.

As stated above, while the McBride case offers an interesting comparison, the fact situation is not entirely the same as in the case at bar. For example, it appears here that Robert, who put the seed on the floor, was also an officer of the corporation. In the McBride case, this court said that there was substantial reason for believing that Horrigan was attempting to use a corporate legal entity as a shield of protection for himself in his unlawful activity of selling liquor. There is nothing in the record in the case at bar which would justify our saying that the corporation was formed for the purpose of shielding defendant in an unlawful activity or that the corporation was used by him as an instrument of fraud so as to permit us to disregard the corporate entity. The only place under the facts and circumstances here where it would appear that the jury would be justified in its conviction of defendant is on the question of whether he participated in a wrongful act, either directly or as an aider, abettor, or accessory. As was the situation in the McBride case, there were substantial reasons here for a jury to believe that defendant was not only an officer but also the general manager and overseer of the business. At least his son Robert considered him such, and the background of defendant's long association and connection with the hardware and implement business in Long Prairie is convincing that he was in fact, for all practical purposes, the general manager. It was a family-owned business; and, while it appears that of late years defendant had had some able help and assistance from his sons, Everett W. and Robert, it is quite reasonable to believe that defendant was generally considered by those associated with him as the general manager and overseer of the business in addition to his duties as president of the corporation.

■ We next consider defendant's participation in the unlawful act with which he is charged, either directly or as an aider, abettor, or accessory.

It is our opinion, under the record here, that a jury could well consider that defendant directly participated in the unlawful act charged. It must be remembered that M. S. A. 21.03, subd. 2, provides that it is unlawful for any person to sell any agricultural seed with a weed seed content per pound in excess of "25 seeds of * * * Hoary Alyssum (Berteroa incana), singly or collectively." "Person," as defined in § 21.01, subd. 2, includes a corporation; and under § 21.01, subd. 8, "sell," when applied to agricultural seed, is construed to include not only the act of selling, but the act of offering or exposing for sale or having in possession with intent to sell. It can hardly be said that defendant did not participate directly in at least the act of offering and exposing the seed for sale, or having it in possession with intent to sell. It is undisputed that when the inspector arrived that day and took the sample the sack of seed from which it was taken was standing in about the middle of the sales floor with the top of the bag open and turned back. It is true that defendant did not personally put the sack of seed there. However, it cannot be said that he did not participate in or know that it was on the floor offered or exposed for sale. Hammerbeck's testimony stands uncontradicted that defendant came into the store about the time the former finished sampling; that he asked defendant to permit him to take the original tag off the bag, which was refused; and that he requested defendant to sign as a witness on the report, which was also refused. This testimony indicates that defendant not only knew that the sack of seed was on the floor exposed for sale, but also that he had some control over it, in that he could refuse to permit the original tag to be removed. This refusal would indicate also, in the light of all the other testimony, that he must have had managerial or overseeing power over the business.

We find no reason for reversal in connection with the errors assigned, and we conclude that there was sufficient evidence to sustain the conviction of defendant.

Affirmed.